UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARNELL A. MCLENDON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 09 C 3739 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| MICHAEL ASTRUE, COMMISSIONER ) | |
| OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Darnell Artez Mclendon, has filed a motion seeking summary reversal and/or remand of a final decision by the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Supplemental Security Income ("SSI"). For the following reasons, Mr. Mclendon's motion for summary judgment to reverse and/or remand the ALJ's determination is granted (doc. # 20).[2]

I.

We begin with an overview of the procedural history of this case. On April 9, 2004, Mr. Mclendon filed for SSI based on an alleged disability beginning March 3, 2003 (R. 84).[3] He listed the illnesses limiting his ability to work as: "diabetic/sinus/mentally crazy/blurred vision/migrane [sic] headaches" (R. 89). Mr. Mclendon's claim was denied initially and on reconsideration (R. 7,

---

[1] On September 18, 2009, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 13, 16).

[2] Mr. Mclendon's memorandum in support of his motion is also listed as a "motion" on the docket sheet (doc. # 21). In addition, while the Commissioner did not file a separate motion for summary judgment, in its response memorandum, the Commissioner asks that its final decision be affirmed (doc. # 23, Def.'s Mem. at 12).

[3] The Court notes that many of the dates in the record are inexplicably listed incorrectly in Mr. Mclendon's memorandum in support of his motion for summary judgment (doc. # 21, Pl.'s Mem.).

65). Mr. Mclendon filed a timely request for a hearing on August 22, 2005 (R. 59). On July 12, 2007, Mr. Mclendon appeared and testified before Administrative Law Judge ("ALJ") Percival Harmon (R. 212). Mr. Mclendon was informed of his right to representation, but chose to appear and testify without an attorney (R. 216-17). In response to preliminary questioning by the ALJ, Mr. Mclendon indicated that he had seen medical professionals at Provident Hospital and Near South Health Center (R. 219-20). The ALJ stated that he was missing various medical records from these facilities, and he postponed the hearing pending his receipt and review of these documents (R. 220-21).

The hearing was rescheduled for October 15, 2007 (R. 224). Mr. Mclendon again chose to proceed in the absence of an attorney (R. 227-28). Mr. Mclendon and Vocational Expert ("VE") Richard J. Hamersma testified at the hearing. On October 26, 2007, the ALJ issued an opinion finding Mr. Mclendon was not disabled as defined by the Social Security Act ("the Act") (R. 7). The Appeals Council denied Mr. Mclendon's request for review on June 9, 2009, making the ALJ's decision the final decision of the Commissioner under 42 U.S.C. § 405(g) (R. 4).

## II.

We now turn to the record of the decision being reviewed.

### A.

Mr. Mclendon was born on June 20, 1968 (R. 230). Mr. Mclendon is six foot two, and he weighed 195 pounds at the time of his hearing in October 2007 (R. 232-33). He has a GED and began, but did not complete, the first year of junior college (R. 231). At the time of his hearing, Mr. Mclendon did not receive any income from public aid, though he did receive food stamps (R. 232).

Mr. Mclendon lives with his father, who is a mail carrier (R. 231-32). He has six children but has never been married (R. 152, 84). Mr. Mclendon testified that he is able to sweep and do basic household chores, but "nothing extravagant" (R. 238). His father's girlfriend does most of his cooking (*Id.*). Mr. Mclendon stays home and watches a lot of television, especially sitcoms and short sports games (R. 245-46). He drives once every couple of days (R. 246). Mr. Mclendon has a past history of alcohol and drug abuse, but he denied any ongoing alcohol or drug abuse at the hearing (R. 152, 249). He walks about half a mile a day for exercise (R. 249).

Between 2002 and 2003, Mr. Mclendon worked for Prairie Packing as a laborer on the assembly line and as a security guard at Kingston Mines (R. 90, 233-34). As a security guard, he did not carry a gun (R. 109). While Kingston Mines did not provide training, he attended security guard training for about six months sometime between 1993 and 1996 (R. 256-57). Between 1997 and 2000, Mr. Mclendon worked at Doctors Hospital as a patient transporter, at Kranzten Studios as a shipping clerk, and at Acme Barrel Company as a laborer (R. 95).

**B.**

Mr. Mclendon attributes many of his alleged ailments to his diagnosis of insulin dependent diabetes mellitus and hypertension in May 2003 (R. 151, 158). His diabetes caused him to lose significant weight, from 250 pounds in 2003, to 215 pounds when he filed for SSI in April 2004, to 195 pounds on the date of his hearing (R. 89, 151, 233). According to Mr. Mclendon, he does not sleep well at night, getting at most "a good two to three hours," because his diabetes causes him to get up to use the restroom up to twenty times in a twenty-four hour period (R. 119, 241). He does not wear glasses, but his vision is sometimes blurry or sharp, depending on his sugar levels (R. 244, 246-47). Mr. Mclendon asserted that his diabetes often makes him tired, weak, and thirsty (R. 89,

3

117, 140, 247). He has complained of nausea due to his sugar levels and the medication he takes to control his sugar levels (R. 122-24).

Mr. Mclendon testified that he takes insulin twice daily and goes to the Near South Health Center about once every three months to have his blood pressure, temperature, and sugar levels checked (R. 239, 243). He has been prescribed Metformin and Glucotrol to control his diabetes (R. 158, 173). He testified that the medicines he takes for his diabetes make him tired and irritable and give him headaches (R. 143). Mr. Mclendon testified that he gets headaches every three days, for which he takes aspirin, Tylenol, or Motrin (R. 146, 251-52). Mr. Mclendon was prescribed Enalapril for high blood pressure in May 2004, and he testified that this medication also makes him cranky and tired (R. 146-47, 243, 245). Mr. Mclendon takes over-the-counter medicine for his sinus issues and side cramps (R. 244).

Mr. Mclendon visited the Provident Hospital emergency room in April 2004, January 2005, July 2005, and 2006 due to complications from his diabetes (R. 92, 124, 142, 239-40). Although Mr. Mclendon testified that he regularly visited Near South Health Center to check his blood sugar levels, he was also listed as a "no show" to these appointments several times (R. 204-208, 211).

On June 26, 2004, Dr. Heliodoro Medina performed an internal medicine consultative examination on Mr. Mclendon. Dr. Medina noted Mr. Mclendon had dehydration associated with his diabetes, and that Mr. Mclendon was unaware of how well he controlled his diabetes (R. 156). Mr. Mclendon described his sinus problems to Dr. Medina "as feeling congested in the sinuses and having something drip in the back of his nose into his throat" (*Id.*). Notes from Near South Health Center on August 15, 2007, indicate that Mr. Mclendon has chronic sinusitis probably due to cocaine snorting (R. 211). Dr. Medina also noted that Mr. Mclendon has a slightly decreased field of vision,

and that his orientation, memory, appearance, behavior, and ability to relate during the examination were within normal limits (R. 156-57).

On August 19, 2004, Dr. Mark Buranosky conducted an ophthalmology consultative examination on Mr. Mclendon because of Mr. Mclendon's complaints of blurry vision in both eyes (R. 176). Dr. Buranosky opined that Mr. Mclendon would benefit from corrective lenses, but that he did not have retina damage from diabetes ("diabetic retinopathy") (*Id.*).

On September 2, 2004, Dr. Earl W. Donelan performed a physical Residual Functional Capacity ("RFC") assessment on Mr. Mclendon. He opined that Mr. Mclendon could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty five pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and had an unlimited ability to push and/or pull (R. 180). Dr. Donelan opined that Mr. Mclendon's symptoms, such as blurry vision and headaches, were due to his failure to regulate his blood sugar levels (*Id.*).

In a second RFC assessment on February 17, 2005, Bone Ernst[4] agreed with Dr. Donelan's assessment (R. 195). Mr. Ernst opined that Mr. Mclendon's blurry vision was related to his failure to regulate his blood sugar levels, and that Mr. Mclendon's eyestrain caused his headaches (*Id.*). Both Dr. Donelan and Mr. Ernst found that Mr. Mclendon had difficulty with depth perception and should avoid ladders, ropes, and scaffolds, as well as hazardous machinery (R. 181-82, 196-98).

## C.

Mr. Mclendon testified that he also has depression which "comes and goes," and prevents him from doing some of the things he used to do, "like work" (R. 253-54). Mr. Mclendon also

---

[4]Bone Ernst is referred to as "Mr." because there is no indication of his creditials in the record.

asserted that he has a poor memory and has trouble concentrating, so he does not use the stove or venture far from home (R. 117-18, 128). In an Activities of Daily Living ("ADLs") questionnaire from January 2005, Mr. Mclendon claimed to hear voices and see people who are not there, but in a May 2005 questionnaire he denied this (R. 118, 129). Mr. Mclendon asserted that he is easily annoyed and bothered, is distrustful of others, and is sometimes concerned that people are trying to hurt him (R. 119, 130). He has never sought help for his alleged mental ailments (R. 91, 110).

On June 14, 2004, Dr. Helena M. Radomska performed a psychiatric evaluation on Mr. Mclendon (R. 151). Mr. Mclendon informed Dr. Radomska that he often felt depressed and hopeless, that he had memory problems, and that he had trouble falling asleep (R. 151-53). Mr. Mclendon did not report having suicidal thoughts or impulse control problems (R. 153). Dr. Radomska found that Mr. Mclendon did not have any problems with remote or recent memory, but that he did have "some problems" with his sensory and mental capacity (R. 154). During the examination, Mr. Mclendon stated that the date was Friday, June 12, 2003, when in fact it was June 14, 2004 (R. 153). Mr. Mclendon could not recall numbers given to him in forward or backward order (*Id.*). In addition, Mr. Mclendon could not remember two of five objects that Dr. Radomska showed him after one minute and three of five objects that she showed him after five minutes (*Id.*).

Dr. Radomska reported that Mr. Mclendon's thought processes were linear (R. 153). She found that Mr. Mclendon had trouble with abstract thought and recognizing similarities and differences between objects, and that he had judgment and insight problems and partial auditory and visual hallucinations – although he was not delusional or confused during the evaluation session (R.

153-54).[5] Dr. Radomska concluded that Mr. Mclendon had major depression that was untreated "and probably secondary to [his] general medical condition," a possible organic brain disorder secondary to drug use, and a Global Assessment Functioning ("GAF") score showing his level of functioning at 45 (R. 154).

On July 7, 2004, Carl A. Hermsmeyer, Ph.D., performed a psychiatric review and mental RFC assessment on Mr. Mclendon (R. 162-70). Dr. Hermsmeyer evaluated whether Mr. Mclendon's mental impairments met or equaled Listing 12.04 for affective disorders. *See* 20 C.F.R. § 404.1520a. Dr. Hermsmeyer found that Mr. Mclendon was mildly restricted in ADLs; moderately limited in maintaining social functioning; moderately limited in maintaining concentration, persistence, or pace; had no episodes of decompensation of extended duration, and had no additional functional limitations (R. 164-65). Dr. Hermsmeyer determined Mr. Mclendon did not satisfy the "paragraph C" criteria necessary to meet Listing 12.04 (R. 165). He also found that although Mr. Mclendon was moderately limited in his ability to understand, remember, and carry out detailed instructions, he was not otherwise significantly limited in his mental activities (R. 167-68). Dr. Hermsmeyer concluded that despite Mr. Mclendon's history of substance abuse and untreated major depression, he has the mental capacity to perform simple tasks (R. 169).

On February 13, 2005, a second psychiatric review and mental RFC assessment was performed for Mr. Mclendon by Lionel Hudspeth, Psy.D. (R. 187). Dr. Hudspeth found that Mr. Mclendon had mild limitations in his ADLs; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no extended episodes of

---

[5]During the interview, Mr. Mclendon said he sometimes "hears somebody calling his name off and on, and that sometimes when he is outside he sees birds that fly around" (R. 152). We note that he also claimed to hear voices in a subsequent ADL questionnaire in January 2005, but then denied this in a May 2005 questionnaire (R. 118, 129).

7

decompensation (R. 191). Dr. Hudspeth considered Listings 12.04 and 12.09 (substance addiction disorders). He concluded that Mr. Mclendon's mental impairments were not severe, and that Mr. Mclendon was depressed due to his adjustment to his recent diagnosis of diabetes and his life without alcohol and substance abuse for the last three years (R. 187, 190, 193). On June 7, 2005, Dr. Hermsmeyer reviewed Dr. Hudspeth's conclusions and affirmed them as written (R. 136).

### D.

At the hearing on October 25, 2007, the ALJ questioned Mr. Mclendon about his symptoms and alleged impairments. Mr. Mclendon explained that he is often thirsty and tired, that his vision is blurry or sharp depending on his blood sugar levels, and that he gets severe headaches every three days, though aspirin helps (R. 246-47, 251-52). As described above, he also testified that he has problems with his sinuses, ability to concentrate, sleeping, and patience; he also uses the bathroom often (R. 248). Mr. Mclendon testified that these problems would make it difficult for him to work an eight-hour shift because he may only be able to be on his feet for an hour or hour and a half, and he may not be able to stand for more than ten minutes straight (R. 250-53). Further, Mr. Mclendon testified that although he could lift more than a gallon of milk and dress and bathe himself, he would have trouble lifting a ten-pound sack of potatoes (R. 250-51).

The ALJ also asked Mr. Mclendon about depression (R. 253). As explained above, Mr. Mclendon testified that his depression "comes and goes," and that he cannot do some of the things he used to do, like work (R. 253-54). The ALJ then gave Mr. Mclendon the opportunity to state anything else on the record, and Mr. Mclendon reiterated the seriousness of diabetes and the toll it has taken on his life (R. 254-55). Mr. Mclendon described his diabetes like "a little cancer" that caused tiredness, loss of eyesight, headaches, kidney failure, and potential amputation (R. 254).

The VE, Mr. Hamersma, testified after Mr. Mclendon. The VE stated that Mr. Mclendon's past employment at Prairie Packing and Kingston Mines did not require special training and was generally medium in exertion and unskilled (R. 256, 258). The ALJ gave the VE three hypothetical situations for a person of Mr. Mclendon's age, work history, and education, and asked him to determine whether the hypothetical person would be able to return to work. In the first hypothetical, the person was limited to unskilled work of a routine and simple nature, who could occasionally lift and carry fifty pounds a short distance; frequently lift and carry twenty-five pounds; sit, stand, or walk up to six hours of an eight-hour shift with customary breaks; was restricted from using hazardous machinery or working on ladders, ropes, or unprotected heights; and lacked good depth perception (R. 258). The VE opined that individual could return to Mr. Mclendon's past work, and about 9,000 hand-packaging jobs, 2,500 inspection jobs, and 6,000 assembly jobs would also be available to this hypothetical person in the local Chicago six-county metropolitan area (R. 258-59).

The second hypothetical person was further restricted to occasionally carrying a maximum of ten pounds and frequently less than ten pounds (R. 259). In addition, during an eight-hour shift, the hypothetical person could sit for six hours only with customary breaks, and standing and walking was limited to two hours out of the eight-hour period and for no more than ten to fifteen minutes at a time (*Id.*). The VE testified that "the same jobs would also exist" for this individual, "[t]he assembly would be 8,000, hand-packing, two, and inspection, two" (*Id.*).

In the final hypothetical, the restrictions of the second situation applied, but the hypothetical person also suffered from bad headaches that caused him to be off task and unable to work for up to two hours out of the workday, six to ten days per month (R. 259-60). The VE responded that this hypothetical person would be unable to perform the previously described work or "any jobs that [he]

could testify to" (R. 260). Mr. Mclendon stated that there were no additional questions he wished to ask the VE (*Id.*).

### III.

In his written opinion, the ALJ found that Step 1 was met because Mr. Mclendon had not been engaged in substantial gainful activity since April 9, 2004, the date of his application for SSI (R. 9). At Step 2, the ALJ determined that Mr. Mclendon's insulin dependent diabetes mellitus and hypertension were severe (*Id.*). However, the ALJ ruled that Mr. Mclendon's depression and past history of substance abuse (in remission) were not severe impairments because they caused only minimal limitations in his ability to perform basic mental work activities; Mr. Mclendon had no more than mild limitations in ADLs; social functioning; and concentration, persistence, and pace; and he had experienced no episodes of decompensation (R. 9-10). The ALJ noted that although Mr. Mclendon did not suffer from a severe mental impairment, the ALJ still factored Mr. Mclendon's depression into his RFC assessment (R. 10).

With regard to Mr. Mclendon's allegations of depression, the ALJ found that the preponderance of objective medical facts did not support Dr. Radomska's finding that Mr. Mclendon had major depression and a GAF rating of 45 (R. 12). The ALJ reasoned that the record was devoid of evidence that Mr. Mclendon's depression was treated with medication or psychotherapy, and the ALJ questioned Dr. Radomska's reliance on Mr. Mclendon's subjective complaints in making her diagnosis (*Id.*).

The ALJ reviewed Dr. Medina's examination which, despite Mr. Mclendon's complaints, was "essentially unremarkable" (R. 10). The physical, neurological, and mini-mental status examinations were within normal limits (*Id.*). In addition, during that examination, Mr. Mclendon's

10

orientation, memory, appearance, behavior, and ability to relate during the examination were within normal limits (*Id.*). The ALJ noted that the results of Dr. Medina's examination contrasted to the results of Dr. Radomska's examination just one week prior, at which Mr. Mclendon related symptoms of sleep, appetite, and mood disturbance, feelings of hopelessness and worthlessness, decreased energy, memory and concentration problems, and partial and visual hallucinations (*Id.*).

At Step 3, the ALJ considered whether Mr. Mclendon's diabetes mellitus and hypertension met or medically equaled a listed impairment (R. 11). The ALJ found that Mr. Mclendon's impairment or combination of impairments did not meet the requirements of Listing 9.08 (diabetes mellitus), such as serious impairment of his motor functions or vision (*Id.*). The ALJ noted that Dr. Buranosky's ophthalmology examination did not reveal any significant abnormalities, and there was no evidence of diabetic retinopathy, despite Mr. Mclendon's blurry vision and problems focusing (*Id.*). The ALJ also found that Mr. Mclendon had not met the requirements of Listing 4.03 (hypertension), which requires effects such as end organ damage (*Id.*). Further, Mr. Mclendon's impairments appeared to be reasonably controlled with medication (*Id.*). The ALJ then determined that Mr. Mclendon has the residual functional capacity ("RFC"):

> to perform a limited range of unskilled, routine, and simple light and sedentary work–that is, he is limited to lifting/carrying 10 pounds occasionally and less than 10 pounds frequently; sitting 6 of eight hours; and standing 2 of 8 hours (10 to 15 minutes continuously). The claimant is further restricted for [sic] performing work requiring good depth perception, the use of ladders, ropes, or scaffolds, or hazardous machinery or at dangerous heights.

(*Id.*).

In determining the RFC, the ALJ found Mr. Mclendon less than credible on certain issues. For example, the ALJ stated that although Mr. Mclendon testified that he urinates approximately

twenty times per day, that level of frequency was not corroborated by the medical evidence (R. 12). In addition, although Mr. Mclendon testified to taking his insulin daily as prescribed, the medical evidence indicated issues of non-compliance and multiple failures of Mr. Mclendon to show for his appointments at Near South Health Center (*Id.*). Further, the ALJ stated that the objective evidence did not support either Mr. Mclendon's claims of headaches every three days that can last for two hours or his claimed need to sleep two to three times a day; rather, the evidence was that he felt tired, had occasional blurred vision, diminished depth perception, and hypertension that occasionally caused headaches (*Id.*).

At Step 4, the ALJ determined that Mr. Mclendon had no past relevant work to which he could return (R. 13). At Step 5, the ALJ found that considering Mr. Mclendon's age, education, work experience, and RFC, there were significant jobs in the national economy that he would be able to perform (*Id.*). The ALJ determined that Mr. Mclendon could perform the jobs of hand packer (9,000), assembler (6,000), and inspector (2,500) (*Id.*).[6] Accordingly, the ALJ found Mr. Mclendon not disabled (R. 14).

## IV.

Under the governing legal standards, in order to establish a disability under the Act, claimants must show an "inability to engage in any substantial gainful activity by reason of any medically

---

[6]The RFC adopted by the ALJ had the same limitations as the ALJ included in his second hypothetical to the VE. The VE stated that the second hypothetical person could perform the "same jobs" as the individual in the first hypothetical. In response to the first hypothetical, the VE had testified that the individual could perform about 9,000 hand-packaging jobs, 2,500 inspection jobs, and 6,000 assembly jobs. The ALJ's decision adopts this analysis. The VE's answer to the second hypothetical, however, was slightly inconsistent, because after stating that the "same jobs" were available, the VE stated that 8,000 assembly jobs, 2,000 hand-packing jobs, and 2,000 inspection jobs would be available to the second hypothetical individual. This inconsistency would not affect the ALJ's Step 5 conclusion that there were significant jobs in the national economy available to Mr. Mclendon. *See Coleman v. Astrue*, No. 07-1729, 2008 WL 695045, at *5 (7th Cir. Mar. 14, 2008) (error in exact number of jobs available in economy was harmless where significant number of jobs remained available to claimant).

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Further, claimants must show that their impairment(s) prevent them from performing both their prior employment as well as any other job generally available in the national economy. 42 U.S.C. § 423(d)(1)(A).

The social security regulations outline a five-step test for determining whether a claimant has a disability. The ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairments meet or equal any impairments listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is able to return to past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)(4).

While judicial review of ALJ decisions "is deferential, it is not abject. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). We uphold an ALJ's decision if it is supported by substantial evidence; that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations and quotations omitted). Although the ALJ is not required to address every piece of evidence or testimony presented, the Court "cannot uphold an administrative decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker*, 597 F.3d at 921 (internal citations omitted).

In his motion to reverse the ALJ's decision, Mr. Mclendon, now represented by an attorney, argues that the ALJ's opinion erroneously found that his mental impairments were not severe.

13

Specifically, Mr. Mclendon contends that the ALJ improperly rejected Dr. Radomska's diagnosis of major depression and other findings, and substituted his own inexpert opinion (Pl.'s Mem. at 5-6; doc. #24: Pl.'s Reply at 2). In his opinion, the ALJ found that Mr. Mclendon's substance abuse and depression were "non-severe" because "the claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in his ability to perform basic mental work activities," and "[t]he record reflects that the claimant has no more than mild limitations in all functional areas–activities of daily living; social functioning; and concentration, persistence, and pace," with no episodes of decompensation (R. 9-10). We find multiple shortcomings in the ALJ's analysis that resulted in that finding.

*First*, to evaluate a claimant's mental impairments, an ALJ must apply the "special technique" set forth in the regulations, which requires that the ALJ:

> evaluate the claimant's 'pertinent symptoms, signs, and laboratory findings' to determine whether the claimant has a medically determinable mental impairment. If the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. . . . The ratings in the functional areas correspond to a determination of severity of mental impairment.

*Craft v. Astrue*, 539 F.3d 668, 674-75 (7th Cir. 2008) (citing 20 C.F.R. § 404.1520a; 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq.*). "If the ALJ rates the first three functional areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. Otherwise, the impairment is considered severe . . ." *Id.* at 675.

While the ALJ referred to the special technique in his opinion, he did not apply the technique to the evidence in the record, and thus failed to build the "logical bridge between the facts of the case and the outcome" – his decision that Mr. Mclendon's mental impairment was not severe. *Parker*,

14

597 F.3d at 921. For example, although the ALJ found that Mr. Mclendon's functional limitations were mild, the ALJ did not reference the opinions of either of the mental RFC examiners in the record, Dr. Hudspeth or Dr. Hermsmeyer. On February 13, 2005, Dr. Hudspeth found that Mr. Mclendon had only mild functional limitations (R. 191), an opinion that Dr. Hermsmeyer "affirmed" without discussion on June 7, 2005 (R. 136). However, on July 7, 2004, Dr. Hermsmeyer had concluded that Mr. Mclendon was moderately limited in maintaining social functioning and in maintaining concentration, persistence, or pace (R. 164-65) – a conclusion that would support a finding of a severe mental impairment. Dr. Hermsmeyer's June 2005 report does not acknowledge or explain his contrary June 2004 conclusion; nor does the ALJ address this conflicting medical evidence.

In *Craft*, the Seventh Circuit held that the ALJ's failure to mention the claimant's mental RFC assessment, or to explain the weight that the ALJ gave to the various psychiatric assessments, violated the ALJ's requirement to build an "accurate and logical bridge" between the recitation of the mental medical evidence and the determination of the claimant's mental RFC. *Craft*, 539 F.3d at 677-78. Although an ALJ is not required to mention every piece of evidence, in *Craft*, the Seventh Circuit found "particularly critical," among other things, the ALJ's failure to mention that the mental RFC assessment stated that the claimant was moderately limited in social functioning and concentration, persistence, or pace, as well as in the ability to understand, remember, and carry out detailed instructions, *Id.* at 678 – the same categories in which Dr. Hermsmeyer originally found Mr. Mclendon to be moderately limited. "[T]he failure to mention this detailed mental assessment is cause for concern." *Id.* at 679. The Commissioner's discussion of Drs. Hermsmeyer's and Hudspeth's findings in its legal memorandum (*see* Def.'s Mem. at 3) cannot overcome the ALJ's

15

failure to address the conflicting evidence in his opinion. Well-settled law "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker*, 597 F.3d at 922.

*Second*, the ALJ also erred in his treatment of Dr. Radomska's report, which was the only psychiatric examination of Mr. Mclendon in the record.[7] In June 2004, Dr. Radomska found that Mr. Mclendon had untreated major depression, probably secondary to his diabetes, and a possible organic brain disorder, secondary to his drug use, with a GAF of 45 (R. 154). The ALJ acknowledged that Mr. Mclendon informed Dr. Radomska of "symptoms of sleep, appetite, and mood disturbance, feelings of hopelessness and worthlessness, decreased energy, memory and concentration problems, partial auditory hallucinations, and some visual hallucinations" (R. 10). However, the ALJ rejected these complaints because they had "no apparent objective support" (*Id.*).

The ALJ reviewed Dr. Radomska's report and concluded independently that Dr. Radomska's diagnosis of major depression with a GAF of 45 was wrong because "there were no emotional reactions noted; he had normal stream of conversation; thought processes were linear; he denied any hallucinations; he was not confused; and he had no impulse control problems" and "[t]here is no reason to assess anything more than mild limitations with regard to the claimant's allegations of depression and associated symptomatology" (R. 12). The ALJ misstated certain observations stated in Dr. Radomska's report: Mr. Mclendon stated he had experienced hallucinations (R. 152), but denied experiencing any "at the time of the interview" (R. 153). In finding that Dr. Radomska's

---

[7] The ALJ noted that it was "interesting" that one week prior to Dr. Radomska's examination, Dr. Medina conducted a thirty-minute internal medicine examination on Mr. Mclendon, including a "mini mental status examination," whose results were "relatively normal" (R. 10). As the ALJ may have recognized with his use of the word "interesting" rather than "contradictory," an internal medicine exam with a "mini" mental status portion finding certain aspects of Mr. Mclendon's demeanor to be "within normal limits" does not equate with a psychiatric examination.

16

report supported nothing more than "mild limitations" (R. 12), the ALJ also failed to address the fact that one month after Dr. Radomska's June 2004 assessment, Dr. Hermsmeyer also concluded that Mr. Mclendon had moderate limitations in maintaining social functioning, as well as in maintaining concentration, persistence, or pace (R. 164).

We conclude that at bottom, the ALJ improperly substituted his own judgment for that of Dr. Radomska. "[A]n ALJ cannot play the role of doctor and interpret medical evidence," and likewise cannot "disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion." *Liskowitz v. Astrue*, 559 F.3d 736, 741 (7th Cir. 2009) (quoting *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)). In reviewing Dr. Radomska's notes and coming to a different conclusion as to Mr. Mclendon's depression, the ALJ stepped into "quintessentially a matter for medical judgment." *Liskowitz*, 559 F.3d at 741. The Court is especially concerned that the ALJ dismissed without any proper basis Mr. Mclendon's low GAF score of 45. While not dispositive, "[t]he GAF scale reports a clinician's assessment of the individual's overall level of functioning," and "[a] GAF of 50 indicates serious symptoms or functional limitations." *Craft*, 539 F.3d at 676 n.7.

*Third*, the ALJ erred in rejecting Dr. Radomska's report on the grounds that "there is basically nothing in the mental status report completed by Dr. Radomska to support her diagnosis of major depression, except for the claimant's subjective allegations" (R. 10, 12). The extent to which a diagnosis of depression may be made based on a person's subjective complaints is again a matter of medical judgment. The ALJ cannot "brush[] aside" a doctor's conclusions merely on the ground that they "seem[ed] to be based solely on the claimant's subjective complaints." *Parker*, 597

17

F.3d at 922 (holding that the ALJ's rejection of the doctors' findings that the claimant had disabling pain based on the claimant's subjective complaints was reversible error).

*Fourth*, the ALJ improperly used the absence of evidence that Mr. Mclendon received medical or psychotherapy treatment for depression as a basis for rejecting Dr. Radomska's report (R. 12). An ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (internal citations and quotations omitted). Before an ALJ may draw inferences about a claimant's condition from the claimant's lack or infrequency of treatment, the ALJ must "explore[] the claimant's explanation as to the lack of medical care." *Craft*, 539 F.3d at 679. Here, as in *Craft*, the ALJ drew a negative inference as to Mr. Mclendon's credibility from his lack of medical care, but the ALJ failed to questioned Mr. Mclendon about the reasons for his lack of treatment. For example, while Dr. Radomska's report stated "no current treatment for depression, poor financial means" (R. 154), the ALJ did not explore whether Mr. Mclendon's lack of treatment was the result of a lack of funds for treatment. This was especially problematic here, where Mr. Mclendon was proceeding without an attorney and was thus questioned only by the ALJ.

The ALJ's opinion has thus failed to build the "logical bridge" between the evidence and the ALJ's conclusion that Mr. Mclendon's mental impairments were not severe. This error cannot be dismissed as harmless, as a finding of a severe mental impairment could affect the RFC determination and the determination at Step 5. Accordingly, we reverse and remand the case for further proceedings consistent with this opinion. In so doing, we express no view as to the merits of Mr. Mclendon's claim that he is disabled by virtue of his alleged mental impairments. Further,

in light of our reversal on this basis, we have no occasion to reach any other arguments raised by Mr. Mclendon in seeking reversal and remand.

## CONCLUSION

For the reasons set forth above, the Court grants Mr. Mclendon's motion to reverse and remand (docs. ## 20, 21). The Court directs the Clerk of the Court to enter judgment in favor of the plaintiff. Terminating case.

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: May 12, 2010**